UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 5:12-CV-0019 |
| | ) | (Chief Judge Bailey) |
| MOUNTAIN STATE CARBON, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

_____)

## UNITED STATES' RESPONSE TO DEFENDANT MOUNTAIN STATE CARBON, LLC'S MOTION FOR SUMMARY JUDGMENT ON THE UNITED STATES' RESOURCE CONSERVATION AND RECOVERY ACT CLAIMS

Plaintiff United States submits this Response to Defendant Mountain State Carbon, LLC's ("MSC") motion for summary judgment on Plaintiff's Resource Conservation and Recovery Act ("RCRA") claims. These claims allege that the coke oven gas condensate ("COGC") that MSC collects from the coke oven gas pipeline at its Follansbee, West Virginia coke manufacturing plant (the "coke plant") is a solid waste that is subject to regulation under RCRA Subtitle C (Plaintiff's Eighth Claim) or, alternatively, Subtitle I (Twelfth Claim).

The submission of both Plaintiff's[1] and MSC's[2] summary judgment briefs reveals agreement by the parties on one point: There are no genuine issues as to any material facts and Plaintiff's claims can be decided as a matter of law. Although Plaintiff disputes certain technical claims and characterizations made by MSC below, there is no dispute as to the essential facts regarding MSC's handling of COGC generated in its pipeline and the nature of MSC's

_____

[1] United States' Mem. in Support of its Mot. for Partial Summary Judgment on its RCRA Subtitle C Claim and to Dismiss Plaintiff's Eighth and Ninth Defenses, Dkt. 137 ("*US Brief*").

[2] Defendant Mountain State Carbon, LLC's Mem. in Support of its Mot. for Summary Judgment on the United States' Resource Conservation and Recovery Act Claims, Dkt. 128 ("*MSC Brief*").

byproducts process.  The real disagreement between the parties arises from the lack of evidence

provided by MSC for any of the beneficial effects it claims arises from the recycling of COGC

into its byproducts plant.  This absence of evidence causes MSC to fail to satisfy its burden not

only to show that its recycling of COGC is legitimate on the merits, but also to provide

appropriate documentation for its claimed exemption as required by 40 C.F.R. § 261.2(f).

Therefore the Court should deny MSC's motion and grant Plaintiff's motion for summary

judgment on its Eighth Claim.

## RESPONSE TO MSC'S STATEMENT OF UNDISPUTED MATERIAL FACTS

**MSC Fact #1**:  As coke oven gas travels through the pipeline, it cools down,
condensing into a liquid called "coke oven gas condensate."

**US Response**:  UNDISPUTED.

**MSC Fact #2**:  Coke oven gas condensate is produced along the COG line and
dropped out at locations known as a drip leg.  The coke oven gas condensate does not remain in
the drip legs for any appreciable amount of time.  Every day, vacuum trucks pick up the coke
oven gas condensate from the drip legs and transport it back to the byproducts plant, where it is
reintroduced into the flushing liquor.

**US Response**:  DISPUTED only as to the verb "reintroduced" in the last clause.

COGC is generated through condensation in the coke oven gas pipeline and is thus not

"reintroduced" into the flushing liquor.  Plaintiff does not dispute that COGC is "incorporated"

into the flushing liquor.[3] *US Brief, Statement of Material Facts, ("SOMF") ¶ 19.*

**MSC Fact #3**:  "Once the coke oven gas condensate is recycled into the system there
is no way to separate it out.  You can't separate coke oven gas condensate from the rest of the
constituents after they've been brought together."

**US Response**:  DISPUTED.  This "fact" is a quotation from a deposition, not a fact.

Plaintiff does not dispute that once COGC is incorporated into flushing liquor, the chemical

[3]The United States disputes the footnote appended to MSC Fact #2 (*MSC Brief, 4, n. 2*) which
consists of legal conclusions instead of facts.

constituents of each material merge and are indistinguishable.

**MSC Fact #4**:  Once coke oven gas condensate is recycled into the system, some portion will always be there.  The alternative would result in coke oven gas condensate being discarded.

**US Response**:  DISPUTED.  Regarding the first sentence, MSC has not provided any analytical studies to support the proposition that some portion of the COGC will *always* remain in the flushing liquor circuit, as opposed to being "excessed" with the excess flushing liquor or removed from the system by evaporation or some other means.  As MSC lacks the capacity to track every molecule of COGC, there is no basis to conclude that some COGC will always remain in the system.  The second sentence is a legal conclusion, not a fact.

**MSC Fact #5**:  Coke oven gas condensate is approximately 98-99.4% water.

**US Response**:  DISPUTED.  MSC has provided no evidence for the 98% figure, and indeed stated in discovery that COGC was as much as 99.9% water (providing no source for that figure).  *US Brief, Ex. 16, No. 33*.  The United States does not dispute that COGC is 99.4% water.  *US Brief, SOMF ¶ 9*.

**MSC Fact #6**:  The temperature of coke oven gas condensate as it leaves the drip legs is not physically measured but can be no higher, and is likely lower, than 212 degrees Fahrenheit.  The temperature of the coke oven gas as it leaves the ovens is nearly 2,000 degrees Fahrenheit.

**US Response**:  UNDISPUTED.

**MSC Fact #7**:  Flushing liquor is used to cool the coke oven gas as it leaves the coke ovens.  The coke oven gas condensate also performs this cooling function once it is recycled into the flushing liquor.

**US Response**:  UNDISPUTED as to the first sentence.  The second sentence is DISPUTED because MSC has not provided evidence demonstrating how, and to what extent, COGC constituents cool coke oven gas after being incorporated into the much larger amounts of flushing liquor.

**MSC Fact #8**:  Coke oven gas condensate also conditions the coke oven gas by removing impurities.

**US Response**:  DISPUTED.  This "fact" is really a hypothesis enunciated by MSC's environmental coordinator, who has not been disclosed as providing expert testimony concerning the chemistry or engineering of coke byproducts production.  MSC has undertaken no chemical mass balances or other technical or scientific studies to support this hypothesis.  *US Brief, Ex. 1 at 159:17-19; Ex. 15 at 40:23-41:8.*  Mr. Bud Smith conceded in his Rule 30(b)(6) deposition that he "[did not] have the chemistry to show all this" and that MSC did not "measure the volumes of these things happening."  *US Brief, Ex. 1 at 158:16-17, 159:12-14*.

**MSC Fact #9**:  Another purpose for recycling coke oven gas condensate into the flushing liquor is to recover valuable commodities in the byproducts plant.

**US Response**:  DISPUTED.  This is MSC's characterization of *why* it mixes COGC into the flushing liquor, not a fact.  On the contrary, the United States contends that the purpose of this practice is to provide a convenient, inexpensive means of disposing of a hazardous waste.

**MSC Fact #10**:  Coke oven gas condensate contains valuable commodities, such as ammonia, benzene, and naphthalene.  These commodities are removed in the by-products plant for sale as products including ammonium sulfate, light oils, sulfuric acid, and tars.

**US Response**:  DISPUTED.  Plaintiff does not dispute that ammonia, benzene, and naphthalene are chemical constituents of COGC, but MSC's characterization of them as "valuable commodities" is unproven.  MSC has disclosed no chemical mass balances or other studies to show how and in what quantities they are "removed."  If these chemical constituents do combine with similar chemical constituents in the "excess" flushing liquor flows to form byproducts, their contribution to the production of such byproducts would be marginal due to the fact that COGC contains small amounts of these chemicals.  *Ex. 1, B. Smith Dep. 155:25-156:6*.

**MSC Fact #11**:  The chart below [*MSC Brief, 5-6*] shows estimates of various byproducts recovered at MSC from 2008-2012.

US Response:  UNDISPUTED.[4]

## PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS

1.  COGC has to be removed from the coke oven gas pipeline to prevent impediments to the flow of gas.  *Ex. 1, B. Smith 30b6 Dep. 163:15-164:3; Ex. 2, Williams Dep. II 23:5-9.*

2.  Accumulated COGC within certain drip legs was historically discharged directly to the ground, a practice which ended sometime after a 1991 consent decree in which MSC's predecessor agreed to "dispose of or treat" the COGC from the Mingo Junction and Steubenville plants back at the coke plant.  *US Brief, Ex. 1 at 168:8-12*; *United States v. Wheeling-Pittsburgh Steel Corp.*, No. C2-88-598, 1991 WL 157355, *5, *7 (S.D. Ohio July 16, 1991).

3.  Leaks and spills of COGC have occurred from drip legs and other appurtenances along the pipeline.  *Ex. 3* (August 14, 2013 West Virginia Department of Environmental Protection ("WVDEP") Notice of Violation ("NOV") for spillage below drip leg found during plan inspection); *Ex. 4,* (March 26, 2012 WVDEP NOV for drip leg condensate spilled onto dirt roadway near process flare); *Ex. 5,* (February 12, 2007 spill onto ground of 200 gallons of COGC); *Ex. 6,* (June 25, 2002 WVDEP NOV for drip leg condensate release).

4.  MSC uses water from the Ohio River for coke plant operations.  *Ex. 7, Lallone Dep. 34:13-15; Ex. 1, B. Smith 30b6 Dep. 16:12-23.*

5.  MSC's byproducts plant was constructed in 1975.  *Ex. 8, Svoboda Dep. 134:17-18.*

6.  Pipeline COGC comprises a relatively small fraction of the contents of the flushing liquor circuit.  *Ex. 2, Williams Dep. II 10:17-11:8.*

---

[4]MSC's referenced support for Fact #11 is a document that only lists the Coal Tar, Ammonium Sulphate (sic), and Light Oil amounts.  The unlisted COG and COGC totals appear plausible.

## STATEMENT OF THE CASE AND SUMMARY OF ARGUMENT

There is no dispute about the key facts concerning MSC's COGC handling practices and the functioning of its byproducts plant.  COGC is formed by condensation in a coke oven gas pipeline, collects in drip legs, and is removed by vacuum truck and taken back to the coke plant. The COGC is then discharged into an open-air trench, through which it flows first to an open-air phenol pit sump, and then to tar decanters where it becomes incorporated with flushing liquor. The pipeline COGC is added to the flushing liquor circuit in sufficiently low volumes that the COGC forms only a small fraction (less than 1%) of the flushing liquor.  Some of that flushing liquor is "excessed" from the tar decanters and flows directly to the ammonia still, where ammonia is recovered, and then on to the wastewater treatment plant.  The rest goes to the coke oven gas collection mains, where it is used to quench the gas coming from the coke ovens.

MSC has to remove the COGC from its pipeline to prevent impediments to the flow of coke oven gas, and its solution to the resulting COGC disposal problem of recycling the material into the flushing liquor circuit – which dates to the 1990's, before which the COGC was discharged to the ground – is understandable.  But leaks and spills of COGC from the drip legs and from the process of transporting the COGC inevitably occur, not to mention the harmful emissions to the air of volatile chemicals in COGC which result from its exposure to the atmosphere in the open-air trench and pit sump.  As a hazardous waste containing benzene and other cancer-causing chemicals, COGC is the type of substance that Congress intended to regulate when it enacted RCRA with its "cradle to grave regulatory management system, with regulatory control attaching to hazardous waste from the point of generation to the point of final disposition."  48 Fed. Reg. 14,472, 14,503 (April 4, 1983).  Plaintiff's Eighth Claim is intended to ensure, by implementing the kinds of secondary containment, leak detection, and tank

6

integrity inspection measures mandated by RCRA Subtitle C, that COGC is handled in a manner that terminates the ongoing benzene emissions and minimizes leaks and spills along the pipeline.

Plaintiff has previously explained why pipeline COGC is a solid waste under RCRA and its implementing regulations.  *See, e.g., US Brief, 11-15*.  In Section I of this Response brief, Plaintiff shows that MSC's handling of COGC fails even to satisfy the 3-factor test for legitimate recycling that MSC gleans from its reading of an EPA RCRA guidance document.  In Section II, Plaintiff demonstrates that MSC has failed also to satisfy the requirements of 40 C.F.R. § 261.2(f), which supplies, aside from the merits, an independent ground for the Court to find MSC liable on Plaintiff's Eighth Claim as a matter of law.  Finally, Section III shows how the factual record undercuts MSC's arguments for dismissing Plaintiff's RCRA Subtitle I claim.[5]

## ARGUMENT

### I.     MSC is Liable under Plaintiff's Eighth Claim for Relief because it has Failed to Satisfy its Burden to Show that COGC is not a Solid Waste

MSC contends that it "legitimately recycles" its pipeline COGC by collecting and discharging it into the coke plant byproducts process, so that it is therefore not discarded and not a RCRA solid waste.  The core of MSC's argument is that this practice meets three criteria for legitimate recycling set forth in an EPA RCRA Guidance document: 1) the recycled material "must contribute positively to the recycling process"; 2) the recycling process must "produce a valuable product"; and 3) the recycler must manage the hazardous material as a valuable commodity.  *MSC Brief, 11-12*.

Under the RCRA Subtitle C regulations, MSC bears the burden of proof on this issue because it is attempting to show that COGC is not a solid waste:

---

[5]Plaintiff did not seek summary judgment on its Twelfth Claim relating to Subtitle I regulation of MSC's underground drip legs.  Adjudication of this alternative claim will be necessary only if MSC is found not liable on Plaintiff's Eighth Claim asserted under RCRA Subtitle C.

> Respondents in actions to enforce regulations implementing subtitle C of RCRA who raise a claim that a certain material is not a solid waste, or is conditionally exempt from regulation, must demonstrate that there is a known market or disposition for the material, and that they meet the terms of the exclusion or exemption.

40 C.F.R. § 261.2(f).  As EPA explained in issuing this regulation, "This provision . . . restates the legal principle that parties claiming the benefits of an exception to a broad remedial statutory or regulatory scheme have the burden of proof to show that they fit the terms of the exception." 50 Fed. Reg. 614, 642 (Jan. 4, 1985) (*citing cases*).

MSC fails to meet its burden of proof in establishing legitimate recycling under each of the three factors.  First, it provides no convincing data or other evidence to show that pipeline COGC contributes positively to MSC's production processes by either cooling coke oven gas or providing chemical constituents that are more than marginally effective for producing coke byproducts.  Second, it fails even to demonstrate that the byproducts it produces – allegedly with the help of COGC – are "valuable."  Finally, MSC's COGC handling processes, in which it allows supposedly valuable COGC constituents like benzene to be emitted into the atmosphere by discharging the COGC into an open-air trench and sump, undercuts its contention that it handles COGC as a "valuable commodity."

A.    COGC does not "Contribute Positively" to MSC's Production Processes

1.    *COGC is Unneeded for Cooling Coke Oven Gas*

MSC fails to produce data or to otherwise document that its pipeline COGC actually contributes to the cooling of the gases coming off the coke ovens.  It requires the Court to *assume* such cooling from the fact that since the COGC is mixed with flushing liquor after being dumped into the tar decanters, some portion of it must travel to the coke oven gas collecting mains with the flushing liquor to quench the gas.  MSC does not provide any estimates of the extent to which the pipeline COGC contributes to such cooling when it undisputedly forms but

"a relatively small fraction" of the flushing liquor.  *Plaintiff's Statement of Additional Undisputed Facts ("US Add'l Facts")  ¶ 6*.  It does not submit expert testimony as to how such an effect is possible.  MSC concedes that it does not measure the temperature of COGC at any point in its management in MSC's industrial processes, even though such temperature readings would help gauge COGC's cooling effects.  *MSC Brief, Statement of Undisputed Facts ("SOF")* ¶ 6.  Instead, MSC merely provides the observation that since the temperature of the coke oven gas is nearly 2,000°F, and the temperature of COGC can be no higher than the boiling point of water, the COGC cools the coke oven gas.  *MSC Brief, SOF ¶¶ 6-7*.  This is a weak evidentiary showing for a party bearing the burden of proving its material is not a solid waste.

In fact, MSC's own summary judgment Declarant suggests that the addition of COGC to the flushing liquor is *unnecessary* for cooling the coke oven gas: "The cokemaking process generates *more flushing liquor than is necessary* to cool all of the COG (and related liquids) that are driven off of the ovens."  *MSC Brief, Smith Decl. ¶ 9* (emphasis added).  In other words, there is so much flushing liquor available for the job of cooling coke oven gas that a portion of it is continuously "excessed."  *US Brief, SOMF ¶ 6*.  COGC is therefore superfluous to the function of cooling the coke oven gas and therefore cannot "positively contribute" to it.

MSC is thus engaging in "sham" recycling, which occurs when a generator of a hazardous waste masks its real intention – surrogate disposal – behind a veneer of "legitimate recycling."  As EPA has noted, "Because there can be a significant economic incentive to manage hazardous secondary materials outside the RCRA regulatory system, there is a potential for some handlers to claim that they are recycling, when, in fact, they are conducting waste treatment and/or disposal in the guise of recycling."  73 Fed. Reg. 64,668, 64,677 (Oct. 30, 2008).  The history of pipeline COGC management by MSC's predecessors indicates that COGC

is simply not needed in the byproducts plant.  The drip legs that now collect the COGC used to be open to the environment; the COGC was literally discharged onto the ground.  *US Add'l Facts ¶ 2*.  This practice ended only in the 1990's, when MSC's predecessor committed to "dispose of or treat" the COGC.  *Id*.  Evidently pipeline COGC was not deemed essential for *any* purpose at the byproducts plant in those days.  MSC has never suggested that any processes at its current byproducts plant, which was constructed in 1975 (*US Add'l Facts ¶ 5*), have changed since then to require the addition of COGC to the flushing liquor.

More important, the paltry amounts of COGC delivered to the byproducts plant suggest that, compared to the immense volumes of flushing liquor flowing there, any cooling effects on coke oven gas attributable to the addition of COGC would be insignificant.  MSC's RCRA expert concedes that pipeline COGC forms "a relatively small fraction of what's in the flushing liquor circuit."  *Ex. 2, Williams Dep. II 11:7-8*.  Plaintiff's expert, Karl Svoboda, calculated that fraction using 2006 figures supplied by WPSC.  He estimated that COGC provides no more than 0.04% of the flushing liquor that flows to the coke oven mains to quench coke oven gas.  *US Brief, Ex. 14, ¶ 11*.  The annual COGC amounts for 2008-2012 supplied by MSC (*MSC Brief, SOF ¶ 11*), point to an even tinier proportion of COGC to flushing liquor.[6]

MSC already uses water from the Ohio River flowing next to the plant for coke plant operations.  *US Add'l Facts ¶ 4*.  Its Rule 30(b)(6) corporate representative testified that water from the river could cool the coke oven gas just as well as flushing liquor.  *Ex. 1, B. Smith 30b6 Dep. 105:18-106:2* ("Physics would say it would cool").  MSC could therefore obtain the same

---

[6]The 2006 figures were based on WPSC estimates of 18,500 lbs/day of COGC delivered to the byproducts plant.  *US Brief, SOMF ¶ 21*.  MSC now indicates that the average annual COGC collections for these years was 2,307,703 lbs. which, divided by 365, comes to 6,322 instead of 18,500 lbs/day.  In short, for the 2008-2012 period the 0.04% estimate may be too high by almost a factor of three.

cooling benefit that it claims pipeline COGC provides by hooking up a garden hose to its normal water supply and discharging it into the open-air trench at the byproducts plant once per day at the same flow rate as the pipeline COGC.  This substitution would have the added advantage of avoiding 1) the leaks and spills which occur from the pipeline, drip legs, and drip truck during handling of the COGC (*US Add'l Facts ¶ 3*), and 2) the ongoing emissions of benzene and other volatile organic compounds to the ambient air which occur from dumping the COGC into the open conveyance trench and pit sump.  *US Brief, SOMF ¶¶ 16-18*.  That MSC prefers to sustain the costs associated with collecting and transporting COGC to the coke plant suggests that the true purpose of this practice is surrogate disposal rather than legitimate recycling.

2.   <em>COGC has at most a Marginal Effect on Byproducts Production</em>

MSC also contends that pipeline COGC contains "valuable commodities" that help produce some of the byproducts that it sells.  Plaintiff does not dispute that certain COGC constituents may in theory join with identical chemicals in the excess flushing liquor to produce certain byproducts such as ammonium sulfate.  The fact is, however, that MSC has failed to produce in discovery a single chemical mass balance, production study, or financial statement showing how and to what extent such physical effects actually occur, or even an expert engineer or chemist to explain these physical effects.  This omission suggests that MSC's assertion that COGC is valuable for this process rests on a dubious foundation, and likely explains why MSC and its predecessors have before now focused exclusively on the benefits of COGC's alleged cooling of coke oven gas in presentations to regulators.[7]

---

[7]In an October 2000 legal memorandum, counsel for MSC's predecessor explained at length why "COG Condensate is *not* a Recycled Solid Waste."  *US Brief, Ex. 10 at 7* (emphasis added).  "When COG Condensate is used as flushing liquor," counsel observed, "it is *not an ingredient being used to make a product*, neither is it substituting for a commercial product," *id*. at *n. 5* (emphasis added), and continued, "WPSC is not even reclaiming the COG condensate."  *Id. at 8*.

To be sure, MSC presents something new in its summary judgment brief: a Declaration from its environmental director, Mr. Bud Smith, who testifies that "[e]ach year, MSC may recover and sell between 20,000 and 50,000 pounds of byproducts recovered solely through recycling of coke oven gas condensate."  *MSC Brief, Ex. 1, ¶ 16*.  The fact that MSC is providing Mr. Smith's estimate to Plaintiff here for the first time is remarkable; more extraordinary still, the Declaration *presents no citation* to support this estimate, let alone any documentation or other evidentiary support.  MSC witnesses – including Mr. Smith (testifying as MSC's corporate deponent) – testified in depositions that MSC did not keep track of byproducts produced from COGC.[8]  Indeed, MSC acknowledged the improbability of making such a calculation when it admitted in discovery that it "cannot distinguish between and among saleable coke byproducts derived from coke oven gas and coke oven gas condensate, including but not limited to *revenues attributable to byproducts derived from coke oven gas pipeline condensate*."  *US Brief, Ex. 13, No. 22* (emphasis added).[9]  If MSC cannot quantify *revenues attributable* to byproducts derived from pipeline COGC, how can Mr. Smith now quantify the byproducts themselves?

It is, moreover, peculiar that Mr. Smith would provide this 20,000-50,000-pound byproducts estimate now after disclaiming his ability to make such an estimate in a deposition:

> Q.  It's your position that coke oven gas condensate conditions coke oven gas, but you're not sure exactly how it does?
> A.  I could not quantify it, no.

*US Brief, Ex. 1 at 160:4-7*.  Mr. Smith similarly denied familiarity with the exact chemicals in COGC that ostensibly combine to form coke byproducts, though he added that "in the old days I could do the chemical formulas to say this carbon can combine with this to make this. . . ."  *Id. at*

---

[8] *US Brief, Ex. 1 at 159:12-14* ("we don't measure the volumes of those things happening"); *id. at 159:24-25* ("we don't measure it").
[9] MSC even characterized the attempt to distinguish between hydrocarbons from coke oven gas and hydrocarbons from COGC as "impossible (and unnecessary)."  *US Brief, Ex. 13, No. 22*.

*160:8-16*.  Although Mr. Smith says he is familiar with "the production, use, and recycling of coke oven gas condensate," evidence of his acquaintance with the byproducts production process at the coke plant is conspicuously absent from his Declaration.  *MSC Brief, Ex. 1, ¶ 3*.  Thus, aside from the obvious problem of a lack of documentation to back up his 20,000-50,000-pound byproducts estimate, it is questionable that his testimony on this subject satisfies minimal standards of admissibility.  *See* FRE 602 ("A witness may testify to a matter only if evidence is introduced to support a finding that the witness has personal knowledge of the matter").[10]

Assuming *arguendo* that Mr. Smith's 20,000-50,000-pound byproducts estimate is both admissible and accurate, it still fails to support the merits of MSC's argument that pipeline condensate is not a solid waste because it is legitimately recycled in the byproducts plant.  In its 1985 regulatory preamble explaining the concept of legitimate recycling, EPA made it clear that if a hazardous secondary material is "ineffective or *only marginally effective* for the claimed use, the activity is not recycling but surrogate disposal."  50 Fed. Reg. at 638 (emphasis added).  Such is the very most that can be said for MSC's pipeline COGC: that it is *marginally effective* for its claimed use of producing coke byproducts.

MSC's own representations are instructive in this regard.  In depositions, MSC witnesses testified that COGC "contains, albeit maybe small, but it contains chemicals that turn into products."  *Ex. 1, B. Smith 30b6 Dep. 156:5-6*.  In discovery responses, MSC characterized "the concentration of regulated chemical substances" in pipeline COGC as "*de minimis*."  *US Brief,*

---

[10]This assumes, moreover, that Mr. Smith's estimate of the byproducts attributable "solely to COGC" in his Declaration constitutes fact testimony.  In reality, his estimate constitutes opinion testimony by a lay witness.  *See* FRE 701(a).  As opinion testimony, MSC was obligated to serve notice of Mr. Smith's 20,000-50,000-pound byproducts estimate under FRCP 26(a)(2)(C) during the expert discovery phase of this case, so that he could be examined about his sources and methods like the other employees and contractors from both parties who served FRCP 26(a)(2)(C) disclosures regarding the opinion testimony they planned to give at trial.

*Ex. 16, No. 33*.  In its summary judgment brief, MSC suggests that only a "small percentage" of the COGC that is deposited into the byproducts plant "is excess to the cooling/conditioning system, like the excess flushing liquor."  *MSC Brief, 15-16*.  In other words, only *a small percentage* of the 2,307,703 pounds of COGC (*MSC Brief, SOF ¶ 11*) delivered on average to the byproducts plant each year undergoes byproducts recovery.  Even then, MSC concedes, COGC comprises "relatively small concentrations of the valuable byproducts" because it is composed primarily of water.  *MSC Brief, 16*.

MSC's confirmation that only small amounts of COGC are available to "positively contribute" to byproducts production is on the mark.  Assuming the accuracy of Mr. Smith's 50,000-pound estimate of COGC's contribution to annual byproducts production, that figure amounts at most to only about *two one-hundredths of one* percent (0.02%) of MSC's annual production of just one byproduct, ammonium sulfate.[11]  If one compared this 50,000-pound COGC-influenced production estimate to MSC's total byproducts production (which is difficult because MSC provides figures for coal tar and light oil in *gallons* instead of *pounds*), it would be far less than 0.02%.  In short, the modest data MSC provides points not to marginal but to *minuscule* effects of COGC on byproducts production.  It serves only to confirm the conclusion of Plaintiff's coke byproducts expert, Karl Svoboda: "Since the quantity of COGC drips is very small, their actual impact on and benefit for . . . the production of byproducts and the cooling of coke oven gas – is for all practical purposes, Nil."  *US Brief, Ex. 14, ¶ 12*.

At the end of the day, MSC's defense to Plaintiff's Eighth Claim rests upon the dubious claim that pipeline COGC's contribution to byproducts production, no matter how small, is

---

[11] 0.02% is the proportion of COGC's alleged maximum contribution to byproducts production (50,000 lbs.) to MSC's average annual ammonium sulfate production (18,458,325 lbs.) reported by MSC.  *MSC Brief, SOF ¶ 11*.

14

sufficient to qualify as legitimate recycling.  But note that under the regulatory standard a material is not just supposed to make a "contribution" to a process in order to be legitimate, that contribution must be *useful*.  40 C.F.R. § 261.43(b) ("Legitimate recycling must involve a hazardous secondary material that provides a *useful contribution* to the recycling process") (emphasis added).[12]  MSC's interpretation would read the adjective "useful" out of the regulatory standard and would sanction the view that any contribution, no matter how infinitesimal, is sufficient to sustain a claim of legitimate recycling.[13]

B.   <u>MSC Provides no Support for its Contention that its Byproducts are "Valuable"</u>

The principle that the recycling produce a "valuable product" is the second of the three legitimate recycling factors that MSC claims to fulfill.  But MSC has to do more than merely *assert* that the products are valuable.  It has to provide evidence.  For instance, MSC baldly states that it sells its byproducts "for profit."  *MSC Brief, 16*.  Yet MSC fails to point to any financial records or other documentation that would support such an assertion.  Although MSC apparently sells certain byproducts, it presents no evidence regarding the costs of producing them, much less the added cost of collecting and transporting the COGC that would otherwise impede the flow of coke oven gas in the pipeline.  In short, MSC has not made its case that its byproducts are

---

[12]Although 40 C.F.R. § 260.43 has yet to be incorporated into West Virginia's regulations, it codified existing Agency interpretations of earlier regulations regarding legitimate recycling and thus provides a useful abridgment of the standards applicable to pipeline COGC.

[13]For this reason, MSC's attempt to use *American Petroleum Institute v. EPA*, 216 F.3d 50 (D.C.Cir. 2000) for the proposition that the amount of value obtained through recycling is irrelevant for finding a discard is misplaced.  In *API*, which addressed a challenge to an EPA rulemaking regarding oil-bearing wastewater recycling practices, the court vacated EPA's decision solely because the Agency had not adequately explained its finding of discard based on the small amounts of oil recovered by the process.  *API*, 216 F.3d at 57-58.  Here, by contrast, Plaintiff presents numerous reasons why MSC's recycling is illegitimate, such as MSC's failure to provide data showing that even small amounts of COGC generate byproducts of sufficient value to legitimize MSC's recycling practice.  The Fourth Circuit also noted, moreover, that EPA's characterization of an industrial byproduct as either discarded or in-process material was entitled to deference.  *Id.* at 57.  This case involves the same type of determination by EPA.

themselves valuable, and not just recovered because the operations that produce MSC's primary product, metallurgical coke, inevitably produce co-products that have to be managed somehow.

      C.      <u>MSC's Discard of COGC into the Open-Air Trench and Pit Sump Shows that it does not Manage COGC as "Valuable Commodity"</u>

MSC claims it satisfies a third factor in determining whether a recycling practice is legitimate: whether the recycler "manage[s] the hazardous secondary material as a valuable commodity, meaning that the recycler views the commodity as important *and works to contain it* as opposed to discarding it." *MSC Brief, 12* (emphasis added).[14]  But MSC does not contain the supposedly valuable constituents in COGC; instead, it discharges pipeline COGC from the drip truck into a grated, open-air conveyance trench leading to a sump that is also open, which allows volatile chemicals in the COGC to escape into the atmosphere.  *US Brief, SOMF ¶ ¶ 16-18.*[15]

This third factor summarizes a principle that EPA restated in a 2008 RCRA Subtitle C rulemaking:

> The generator and the recycler should manage the hazardous secondary material as a valuable commodity. . . .Valuable products should not be allowed to escape into the environment through poor management and this factor clarifies that those hazardous secondary materials that do escape (and are not immediately recovered) are clearly discarded. . . . Hazardous secondary materials that are immediately recovered before they disperse into the environment – air, soil, or water – and are reintroduced in the recycling process are not discarded."

---

[14]MSC mistakenly asserts in this connection that because it "has an entire byproducts plant designed to maximize recovery of COGC," and the COGC is not stored long in the drip legs, it satisfies this factor.  *MSC Brief, 12*.  First, MSC's byproducts plant is designed to maximize recovery of *byproducts*, not COGC, and it was constructed in 1975, when pipeline COGC was discharged to the ground rather than trucked to the byproducts plant.  *US Add'l Facts ¶¶ 2, 5*.  Second, while frequency of recycling is a factor, as shown by *Owens Elec. Steel Co. of South Carolina, Inc., v. Browner*, 37 F.2d 146 (4th Cir. 1994) and other authorities cited by MSC, it is not alone decisive.  If COGC's contribution to byproducts production is not useful, and it is not managed as a valuable commodity, how frequently MSC collects it is irrelevant.

[15]These emissions are highly unusual; Plaintiff's expert, Karl Svoboda, observes,"I don't know of any other coke plant in North America that permits COGC to be exposed to open air in this way; typically, condensate-handling occurs in an entirely closed system."  *US Brief, Ex. 14, ¶ 7*.

73 Fed. Reg. at 64,703-704.  In other words, the management of a material in a manner where a portion of it is lost is more indicative of the material being a waste instead of a commodity, and the material's handling is more akin to surrogate disposal than to legitimate recycling.

Such is the case here.  MSC claims that the COGC constituents benzene, toluene, and naphthalene are prime ingredients of one of its byproducts, light oil.  *US Brief, Ex. 1 at 38:21-24*. Instead of containing these supposedly valuable but volatile constituents in closed conveyance systems, however, MSC lets them escape into the ambient air.  Not only is this inconsistent with managing COGC as a "valuable commodity," but also it is risky given that benzene (along with the COGC constituents arsenic and styrene) is a known carcinogen.[16]  *US Brief, SOMF ¶ 11*.

## II.   MSC has Failed to Provide Appropriate Documentation to Support its Claim that COGC is not a Solid Waste

EPA is clear about what defendants in MSC's position must do:

> Respondents in actions to enforce regulations implementing subtitle C of RCRA who raise a claim that a certain material is not a solid waste, or is conditionally exempt from regulation . . . .  *must provide appropriate documentation . . . to demonstrate that the material is not a waste, or is exempt from regulation*.

40 C.F.R. § 261.2(f) (emphasis added).  Supplying appropriate documentation is a clear regulatory mandate.  Failure to comply with it is grounds for entry of judgment as a matter of law – putting aside the merits issues above – against parties like MSC who allege their recycling is "legitimate."

---

[16] MSC wrongly states that "[c]oncentrations of benzene and all other air toxins [are] far below levels of concern" in the area around the coke plant.  *MSC Brief, 18, n. 9*.  On the contrary, EPA is very concerned about data from the Agency's Air Quality System database revealing that the nearby Steubenville, Ohio air monitoring station has recorded in 2011 and 2012 the highest benzene concentrations of any monitoring stations in EPA Regions 3 *and* 5.  *Ex. 9*.  (Region 3 includes WV, PA, DE, MD, and VA.  Region 5 includes OH, IN, IL, MI, WI, and MN.)  EPA's Toxic Release Inventory database shows that MSC was the second-highest emitter of benzene in Regions 3 and 5 in 2011, and the fourth-highest benzene emitter in 2012.  *Id*.

Although the Agency does not specify which types of records must be kept by a recycling operation, it provides guidance to recyclers as to the types of documentation that might support a claim of legitimate recycling.  For example, since positive economic factors would ordinarily be a strong indication of legitimate recycling, documentation of revenues generated from recycling the secondary material and selling the recycled product, and projections of future costs of processing the secondary materials, are important.  73 Fed. Reg. at 64,706 (Oct. 30, 2008).  EPA observes that while an on-site recycler such as MSC might not formally account for some of the costs and savings of its operation, like any business it will periodically assess whether its recycling process is cost-effective.  *Id.* at 64,707 ("when deciding whether to undertake or continue the recycling operation or to utilize alternative outside recycling or disposal options, the on-site recycler . . . will evaluate the basic economic factors as a part of doing business").  Documentation will invariably be generated from such an evaluation.

As noted above, the documentation supplied by MSC to support its recycling claim is inadequate.  The Declaration of Bud Smith contains a table of annual byproducts and coke oven gas production totals from 2008-2012, as well as annual pipeline COGC collection amounts.  These figures are alone insufficient to support its claim because they provide no indication of the value of these byproducts or the revenues that they generate.  As a result, MSC has not even demonstrated that its byproducts generate a profit – an important criterion in determining that they are "valuable."

The Declaration also contains Mr. Smith's assertion that 20,000-50,000 lbs. of byproducts are recovered "solely through recycling of coke oven gas condensate."  However, as noted above, MSC fails to provide a citation for this estimate, let alone documentation to support it.  Nor does MSC attempt an explanation of how such an estimate can be derived.  Absent any

records demonstrating the contribution of COGC to cokemaking and byproducts production, MSC might have elected, in the expert discovery phase of this case, to submit testimony by an expert engineer or chemist explaining how such a contribution is physically possible, which might have partially filled its "appropriate documentation" gap.  Instead, MSC disclosed only one expert witness on RCRA issues, Marcia Williams, a former 1980s-era EPA bureaucrat whose claimed expertise is not engineering or chemistry, but rather environmental regulations. *Ex. 10, Williams Dep. I 35:11-13* ("I consider myself an expert on the evolution of knowledge and application of remedial regulations").

> EPA explained the rationale for its appropriate documentation rule in 1985:

> Absence of records regarding the recycling transaction is another indication of a sham situation.  Records ordinarily are kept documenting the use of raw materials and products.  Records likewise are usually retained to document secondary material use and reuse.  The Agency consequently views with skepticism situations where secondary materials are ostensibly used and reused but the generator or recycler is unable to document how, where, and in what volumes the materials are being used and reused.  The absence of such records in these situations consequently is evidence of sham recycling.

50 Fed. Reg. at 638.

> In seeking, *on this record*, a ruling on the merits that its recycling of pipeline COGC is legitimate, MSC is asking for a major indulgence from this Court.  To enter judgment in favor of MSC, the Court would have to conclude that the "appropriate documentation" requirement is met when plant personnel simply assert, without supporting records, that a recycling practice is useful because they say it helps produce a small amount of product.  This is not a reasonable construction of 40 C.F.R. § 261.2(f), and MSC's failure to provide appropriate documentation in support of its claim of legitimate recycling flunks its burden and entitles Plaintiff to judgment as a matter of law on its Eighth Claim for Relief.

**III.**   **Plaintiff's Twelfth Claim is Valid because MSC's Underground Drip Legs are Regulated Underground Storage Tanks**

MSC barely puts forward any facts to support its contention that Plaintiff's Twelfth Claim lacks validity.  Assuming *arguendo* that pipeline COGC is not a hazardous waste and Plaintiff's Eighth Claim under Subtitle C fails, MSC's underground drip leg storage tanks which collect COGC would still be regulated under Subtitle I of RCRA.  Pipeline COGC contains benzene (*US Brief, SOMF ¶ 10*), a "hazardous substance" as defined by the Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601(14).  Pipeline COGC is therefore a "regulated substance" as defined in 40 C.F.R. § 280.12.[17]  Regulated underground storage tanks ("USTs") are tanks that are:

> . . . used to contain an accumulation of regulated substances, the volume of which (including the underground pipes connected thereto) is 10 percent or more beneath the surface of the ground.

40 C.F.R. § 280.20.   Defendant claims a series of Subtitle I exemptions which are inapplicable to the coke plant's underground drip legs.  As shown below, these claims of exemption fail.

A.   MSC's Underground Drip Legs are not Waste Water Treatment Units

The wastewater treatment exemption asserted by MSC only applies to UST systems dedicated for use with an on-site wastewater treatment facility.  53 Fed. Reg. 34,079, 34,080, (September 2, 1988).  MSC does not cite a single fact to support this exemption claim.  This is because the record dictates a different conclusion.

---

[17] 40 C.F.R. Part 280 is incorporated by reference into West Virginia's Underground Storage Tank Regulations, Title 33, Legislative Rules Division of Environmental Protection, Series 30. Such regulations were authorized by EPA pursuant to RCRA Section 9004 on September 23, 1997, 62 Fed. Reg.49,620, and became effective on February 10, 1998.  EPA may enforce West Virginia's authorized UST Regulations in lieu of the analogous federal UST regulations pursuant to RCRA Section 9006(a), 42 U.S.C. § 6991e(a).

The primary function of MSC's aboveground and underground drip legs is to collect COGC in order to keep the coke oven gas line clear and maximize the efficient transit of the gas. *US Add'l Facts ¶ 1*.  Presumably, a UST dedicated to the coke plant wastewater treatment plant ("WWTP") would be listed in MSC's National Pollutant Discharge Elimination System ("NPDES") permit application, as would any intervening vessels between the underground drip legs and the WWTP.  Underground drip legs are not mentioned, however, in the MSC NPDES permit application and WWTP diagrams. *Ex. 11*.  MSC's RCRA expert did not even review the coke plant's NPDES permit. *Ex. 2, Williams Dep. II 61:14-17*.  There are numerous intervening vessels between the drip legs and the WWTP, *e.g.*, the drip truck tank, the pit sump, the tar decanter sump, and the excess flushing liquor storage tanks.  According to the testimony of MSC's Rule 30(b)(6) corporate designee, the ammonia still and the Koppers still are the only two vessels from which water is directed to the WWTP. *Ex. 1, B. Smith 30b6 Dep. 117:2-6*.

Plainly, these vessels are not included in MSC's NPDES permit application because these are not dedicated wastewater treatment plant vessels: *i.e.*, they do not treat or store wastewater prior to discharge to the wastewater treatment plant.  Absent regulation under the Clean Water Act ("CWA"), these tanks are not exempt from RCRA regulation. *Ex. 12, at 1* ("The primary reason for the waste water treatment exemption is to avoid imposing duplicative requirements pursuant to both a NPDES permit and a RCRA permit for the same unit").

B.    <u>MSC Cannot Show that the Pit Sump and Tar Decanter Sump are Field Constructed Tanks.</u>

MSC asserts that the pit sump and tar decanter sump are field constructed tanks, claiming the exemption in 40 C.F.R. § 280.10(c)(5).  But MSC provides not a single citation to the record as to the construction of these two vessels.  Notably, it does not even reference these vessels in its Statement of Undisputed Material Facts.  MSC therefore fails to meet its initial burden on

21

summary judgment of showing there is no genuine issue of fact on this issue.  Fed. R. Civ. P. 56(c).  In fact, contrary to MSC's assertions, line drawings of the pit sump produced by MSC indicate that it was built with a manufactured tank.  *Ex. 13*.  MSC's exemption claim is undercut by its witnesses' uncertainty: no MSC employee or expert has been able to demonstrate definitive knowledge as to the construction of the pit sump or tar decanter sump.  *See, e.g., Ex. 1, B. Smith 30b6 Dep. 89:17-91:19*.

        C.      Underground Drip Legs are not Process Tanks

 Key to the definition of "flow-through process tank" is that such a tank form an "integral" part of a production process.  40 C.F.R. § 280.12.  As noted earlier, pipeline COGC forms only a small fraction of the flushing liquor to which it is added.  MSC provides no evidence that the cooling of coke oven gas and the production of byproducts would be impacted by the absence of pipeline COGC.  Moreover, COGC has such an insignificant role in the MSC process that no one at MSC regularly monitors the amount of COGC collected.  *Ex. 14, P. Smith Dep. 144:7-10.*   MSC cannot show how pipeline COGC contributes to its process.  *Ex. 2, Williams Dep. II 57:18-58:5.*  Nor can MSC show whether or how much pipeline COGC ends up in the flushing liquor storage tanks, the ammonia still or the byproducts plant after it is deposited into the pit sump.  *US Brief, Ex. 1 at 121:7-17.*  It is evident from these facts that MSC manages pipeline COGC as a low value material having no critical role in the operation of the facility.  *See, e.g.*, *id. at 139:4-15* (testimony by MSC corporate designees that COGC amounts were originally not measured "because it didn't matter" but that the practice of weighing drip trucks began in order "to work with EPA on that subject").  The lack of significance attached to pipeline COGC shows that the underground drip legs are not at all "integral" to the MSC process, and thus do not qualify as flow-through process tanks.

## CONCLUSION

For the foregoing reasons, the Court should deny MSC's Motion for Summary Judgment on the United States' Resource Conservation and Recovery Act Claims, and grant the United States' corresponding motion.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

/s/ Michael J. Zoeller
MICHAEL J. ZOELLER (DC Bar No. 426476)
JOHN W. SITHER (DC Bar No. 431542)
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 305-1473
michael.zoeller@usdoj.gov

WILLIAM J. IHLENFELD, II
United States Attorney

/s/ Betsy Steinfeld Jividen
OF COUNSEL:                              BETSY STEINFELD JIVIDEN
JOYCE A. HOWELL                          Assistant United States Attorney
Senior Assistant Regional Counsel        1125 Chapline Street, Suite 3000
U.S. EPA Region 3 (3RC30)                Wheeling, WV   26003
1650 Arch Street                         Tel: (304) 234-7763
Philadelphia, PA 19103-2029              Fax: (304) 469-2200
                                         betsy.jividen@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING DIVISION

_____

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )
                                     )
        v.                           )    CASE NO.  5:12-cv-0019-JPB
                                     )
MOUNTAIN STATE CARBON, LLC,          )
                                     )
            Defendant.               )
_____  )

## CERTIFICATE OF SERVICE

I, Betsy Steinfeld Jividen, Assistant United States Attorney for the Northern District of West Virginia, do hereby certify that on this 22nd day of November, 2013 that I electronically filed the foregoing UNITED STATES' RESPONSE TO DEFENDANT MOUNTAIN STATE CARBON, LLC'S MOTION FOR SUMMARY JUDGMENT ON THE UNITED STATES' RESOURCE CONSERVATION AND RECOVERY ACT CLAIMS with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all CM/ECF participants.

/s/ Betsy Steinfeld Jividen
WV Bar No. 3592
Assistant United States Attorney
United States Attorney's Office
P.O. Box 591
Wheeling, WV 26003
Phone: (304) 234-0100
Fax: (304) 234-0112