**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

**UNITED STATES OF AMERICA,**

       Plaintiff,

**v.**                                **Civil Action No. 5:12-CV-19
(BAILEY)**

**MOUNTAIN STATE CARBON, LLC,**

       Defendant.

## ORDER

Presently pending and ripe for ruling are Plaintiff's Motion for Partial Summary Judgment on its Clean Air Act Claims [Doc. 116], Plaintiff's Motion for Partial Summary Judgment on its RCRA Subtitle C Claim and to Dismiss Defendant's Eighth and Ninth Defenses [Doc. 125], and Defendant's Motion for Summary Judgment on the United States' Resource Conservation and Recovery Act Claims [Doc. 127]. For the reasons set forth in this Order, the Plaintiff's Motion for Partial Summary Judgment on its Clean Air Act Claims [Doc. 116] will be GRANTED IN PART AND DENIED IN PART. The plaintiff's Motion for Partial Summary Judgement on its RCRA Subtitle C Claim and to Dismiss Defendant's Eighth and Ninth Defenses [Doc. 125] will be DENIED. The Defendant's Motion for Summary Judgment on the United States' Resource Conservation and Recovery Act Claims [Doc. 127] will be GRANTED IN PART and DENIED IN PART.

On February 6, 2012, the Attorney General of the United States, acting at the

request of the Administrator of the United States Environmental Protection Agency (EPA)[1] filed this action against defendant Mountain State Carbon, LLC (MSC) [Doc. 1].[2]   The United States alleges in its Third and Fifth Claims for Relief in the Complaint that MSC violated the \Clean Air Act, 42 U.S.C. § 7401, *et seq.*, by emitting excessive particulate matter from its coke oven combustion stacks, and excessive hydrogen sulfide in its coke oven gas.  The United States alleges in its Eighth Claim for Relief in the Complaint that the defendant violated the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901, *et seq.*, by failing to comply with coke oven gas condensate (COGC) management requirements.   The Complaint seeks injunctive relief to prevent future violations and the assessment of civil penalties for past and continuing violations of the Clean Air Act and the RCRA.  The defendant moves for partial summary judgment on the United States' Resource Conservation and Recovery Act Claims on the ground that the defendant complies fully with the RCRA and therefore the United States' RCRA claim fails as a matter of law.  It also moves for summary judgment on Claim 12, that various units in the pipeline of COGC are subject to RCRA Subtitle I.

## I.   Background

The defendant, MSC, is a limited liability company owned in equal shares by RG Steel Wheeling, LLC and SNA Carbon, LLC.  MSC has owned a coke manufacturing facility

---

[1]The Complaint originally included as a plaintiff the State of West Virginia, on behalf of the West Virginia Department of Environmental Protection.  The state of West Virginia voluntarily dismissed its claims without prejudice on March 6, 2012 [Doc. 8].

[2]The Complaint also named as defendants SNA Carbon, LLC, and RG Steel Wheeling, LLC.  The additional defendants were dismissed on August 23, 2012 [Doc. 35] and August 22, 2013 [Doc. 107], respectively.

in Follansbee, Brooke County, West Virginia since MSC's creation in September 2005. MSC has operated the facility since September 2012.

The defendant produces coke at the Follansbee coke plant by placing pulverized coal into coke ovens and heating it at high temperatures in the absence of air. During the coking process, a gas known as coke oven gas is produced. The gas is then directed through a recovery process to refine the gas for combustion and make byproducts.

Coke ovens are built in groups known as batteries. The defendant has four batteries at the Follansbee plant, Batteries 1, 2, 3, and 8. Coke oven batteries 1, 2, and 3 contain 145 coke ovens, which were idled in June 2012. Battery 8 contains 79 ovens and remains in operation. The gas combusted in the flues of the coke ovens for each battery is exhausted to the atmosphere through a single combustion stack. It is emissions from these coke oven combustion stacks which are the subject of Claim 3 of the litigation.

The levels of emissions from the coke oven combustion stacks can be determined by visible emission observations (VEOs), which are conducted visually by a qualified observer. On multiple occasions, a qualified observer visually observed smoke and/or particulate matter being emitted from coke oven combustion stacks that exceeded 20% opacity for more than five minutes during a sixty minute period or 40% opacity at any time. The parties contest the impact of the observations.

The defendant also electronically monitors the opacity of emissions from each coke oven combustion stack using continuous opacity monitors (COMs). The COMs take automated emissions opacity readings at least every ten seconds, and six-minute opacity averages are calculated from the 36 or more data points equally spaced over each six-minute period. 40 C.F.R. § 60.13. The COM data show multiple instances of emissions

opacity greater than 40%.  The parties contest whether the data may be used to determine the defendant's liability.

After raw coke oven gas cools, it is sent through a series of processes at an adjoining byproducts plant.  Upon arrival at the byproducts plant, the hydrogen sulfide content of the raw coke oven gas is approximately 240 to 300 grains per 100 cubic feet of gas.  At the byproducts plant, hydrogen sulfide scrubbers reduce the hydrogen sulfide content of the coke oven gas.  An exception is made twice yearly for maintenance of the scrubber and associated processes.  The defendant continuously monitors the hydrogen sulfide content of its coke oven gas as it leaves the byproduct plants.  The defendant's hydrogen sulfide monitoring reports contained instances where the hydrogen sulfide content of the coke oven gas averaged more than 50 grains per 100 cubic feet of gas during a three-hour block of time.  It is emissions from hydrogen sulfide which is the subject of Claim 5 of the litigation.  The parties dispute whether certain instances of elevated hydrogen sulfide levels in the coke oven gas are exempt from liability.

Flushing liquor is used during the coke production and by-products recovery process.  The flushing liquor, comprised of approximately 98% water, is used in multiple ways, including spraying it onto the coke oven gas to cool it.  The flushing liquor which is not used for other purposes, known as "excess flushing liquor," is directed to an ammonia still where the ammonia contained in the flushing liquor is extracted for use in absorbing hydrogen sulfide, and is subsequently converted to ammonium sulfate.

After the coke oven gas is refined and exits the byproducts plant, it enters a pipeline. The pipeline transports the coke oven gas throughout the coke plant, to be used as fuel to the coke oven batteries and to the boiler house.  Historically, the pipeline also pumped the

4

gas across the Ohio River to the Steubenville and Mingo Junction steel plants.  As the coke oven gas travels through the pipeline, it cools, and condensate known as coke oven gas condensate (COGC) forms.  The COGC is at least 98% water.  The remaining components are primarily benzene, ammonia, napthalene, phenols, toluene, arsenic, and styrene.  The COGC flows by gravity into tanks located at various points along the pipeline known as "drip legs."  The drip legs are emptied of COGC once daily on average using a tank truck known as a "drip truck," which uses vacuum pressure to draw the COGC from the drip legs into the tank on the back of the drip truck.  It is the defendant's management of COGC which is the subject of Claim 8 of the litigation.

## II.    Discussion

### A. Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Thus, a summary judgment motion should be granted if the nonmovant fails to make a showing sufficient to establish the existence of an essential element of his claim or defense upon which he bears the burden of proof.  *Celotex*, 477 U.S. at 323.  That is, once the movant shows an absence of evidence on one such element, the nonmovant must then come forward with evidence demonstrating there is indeed a genuine issue for trial.  *Id.* at 323–24.  The existence of a mere scintilla of evidence supporting the nonmovant's position is insufficient to create a genuine issue; rather, there must be evidence on which a jury could reasonably find for the nonmovant.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

### B.  Clean Air Act

The Clean Air Act (CAA) establishes a joint state and federal program to control the Nation's air pollution. The CAA provides national standards on air pollution by requiring the EPA to establish national ambient air quality standards (NAAQS) for certain pollutants, among them sulfur dioxide ($SO_2$), which results from combusting hydrogen sulfide ($H_2S$), and particulate matter (PM).  42 U.S.C. § 7410; 40 C.F.R. §§ 50.4–50.7.  The EPA has established NAAQS for two types of particulate matter, coarse particulate matter with a diameter of 10 micrometers or less, known as $PM_{10}$, and fine particulate matter with a diameter of 2.5 micrometers or less, known as $PM_{2.5}$.  42 U.S.C. § 7602(t); 40 C.F.R. §§ 50.6; 50.7.

The EPA then designates locations as attainment areas, which meet the NAAQS, or nonattainment areas.  The parties do not dispute that Brooke County, West Virginia, where the Follansbee Facility is located, is currently in an attainment area for $PM_{10}$ and certain $PM_{2.5}$ standards.  The County was designated as a nonattainment area for the 2010 $SO_2$ NAAQS on October 4, 2013.  78 Fed. Reg. 47,191 (Aug. 5, 2013).

### C. West Virginia State Implementation Plan

The CAA provides that certain conformity requirements apply to nonattainment areas. 42 U.S.C. § 7506(c)(5).  States create, and the EPA approves, a State Implementation Plan (SIP) to implement and enforce the NAAQS. Id. at § 7410(a)(1).  The West Virginia SIP includes emission limitations for PM and $H_2S$.  40 C.F.R. Part 52, Subpart XX.

The relevant West Virginia SIP limit for PM emissions is:

6

3.1.  No person shall cause, suffer, allow or permit emission of smoke and/or particulate matter into the open air from any process source operation which is greater than twenty (20) percent opacity, except as noted in subsections 3.2, 3.3, 3.4, 3.5, 3.6, and 3.7.

3.2.  The provisions of subsection 3.1 shall not apply to smoke and/or particulate matter emitted from any process source operation which is less than forty (40) percent opacity for any period or periods aggregating no more than five (5) minutes in any sixty (60) minute period.

West Virginia Code of State Rules (WV CSR) § 45-7-3.1, 3.2.

The relevant West Virginia SIP limit for $H_2S$ emissions is:

5.1. No person shall cause, suffer, allow or permit the combustion of any refinery process gas stream or any other process gas stream that contains hydrogen sulfide in a concentration greater than 50 grains per 100 cubic feet of gas except in the case of a person operating in compliance with an emission control and mitigation plan approved by the Director and U.S. EPA. In certain cases very small units may be considered exempt from this requirement if, in the opinion of the Director, compliance would be economically unreasonable and if the contribution of the unit to the surrounding air quality could be considered negligible.

WV CSR § 45-10-5.1.

Title V of the CAA requires major sources of criteria pollutants to have an operating permit that contains applicable emission limitations and standards.  42 U.S.C. § 7661a-7661f.  The West Virginia Department of Environmental Protection issued MSC a Title V permit for the Follansbee facility that contains PM and $H_2S$ combustion limits identical to the West Virginia SIP.  The relevant provisions have remained unchanged since the permit was issued in 2004.

The United States has the authority to bring a civil enforcement action against violators of any applicable SIP emission limit or other requirements.  42 U.S.C. § 7413.

7

**D. Resource Conservation and Recovery Act**

The Resource Conservation and Recovery Act, 42 U.S.C. §§ 6921, *et seq.*, gives the EPA the authority to manage hazardous waste and non-hazardous solid waste.  Subtitle C of the RCRA establishes a federal program to manage the generation, transportation, treatment, storage, and disposal of hazardous waste.

States are permitted to implement their own hazardous waste programs as long as they are "equivalent to" and "consistent with" federal programs.  42 U.S.C. § 6926(b).  The EPA authorized the State of West Virginia to administer and enforce its own hazardous waste management program under RCRA, effective May 29, 1986.  51 Fed. Reg. 17739.  The West Virginia program is implemented under the West Virginia Hazardous Waste Management Act, W. Va. Code §§ 22-18-1 *et seq.*, and various other sections within Title 22 of the West Virginia Code and Title 33, Series 20 of the West Virginia Code of State Regulations.

The United States retains jurisdiction and authority to initiate an independent enforcement action to address violations of authorized states program requirements.  42 U.S.C. § 6928.

**III.   Analysis**

**A. Clean Air Act Claims**

The United States moves for partial summary judgment to establish the liability of the defendant's alleged violations of the Clean Air Act, as set forth in the Third and Fifth Claims for Relief in the Complaint.  The United States alleges that the defendant exceeded air emission regulations and the facility's operating permit by having excessive particulate

emissions from its coke oven combustion stacks in Count 3 and excessive hydrogen sulfide in its coke oven gas in Count 5.

### 1. Particulate Matter Emissions

The plaintiff moves for summary judgment regarding the defendant's liability for the Third Claim for Relief, which alleges that MSC violated the West Virginia SIP and its Title V permit by exceeding the emission limits of smoke and/or particulate matter. The plaintiff bases its contention on visible emission observations and data from electronic monitoring of emissions.

As described above, the West Virginia SIP prohibits the emission of smoke or particulate matter that exceeds 20% opacity for a period aggregating more than five minutes in a sixty minute period or more than 40% opacity at any time. The plaintiff contends that a qualified observer made 19 visual observations of smoke and/or particulate matter emissions that exceeded proscribed emissions limits of the West Virginia SIP. Because the emission limits for particulate matter from combustion stacks contained in the West Virginia SIP are identical to limits in the defendant's Title V Permit, the plaintiff claims that the observations also demonstrate a violation of the Title V Permit.

The plaintiff also contends that COM data gathered from the coke oven combustion stacks show multiple violations of West Virginia SIP emission limits. The United States claims that it may use COM data to establish violations of emission limits under the West Virginia SIP, which permits the Director of the Division of Environmental Protection to use "any credible evidence . . . for the purpose of establishing whether a person has violated or is in violation [of emission limitations]." WV CSR § 45-38-5.1. The United States also

claims that the defendant's Title V Permit expressly allows the United States to use "credible evidence" to establish compliance with or violation of emission limits contained in the permit [Doc. 117 at 14–15]. The United States claims that Courts have accepted COM data to establish violations of emission limits where visual observations were unavailable or incomplete [Id. at 15].

The defendant's response states that the Court should deny the motion for partial summary judgment on the third claim [Doc. 140]. First, the defendant claims that the United States does not allege any violations of the Federal Maximum Achievable Control Technology (MACT) Opacity Standard [Id. at 5]. The defendant contends that the West Virginia legislature has precluded the application of any state rule or regulation that would be more stringent than the federal MACT opacity standard and, as such, the United States' motion fails as a matter of law [Id. at 5–8]. Further, the defendant asserts that even if the United States could base violations on West Virginia CSR § 45-7, it may not use COM data in lieu of VEOs to establish violations of emissions limitations for three reasons. First, the defendant claims that West Virginia's SIP and MSC's Title V Permit specifically mandate use of VEOs to determine compliance with coke oven combustion stack emissions, under West Virginia CSR § 45-7A-2.1.a.1 and MSC Operating Permit at 3.3.5 [Id. at 8]. The defendant claims that using COM data changes the monitoring frequency, which greatly increases the stringency of West Virginia's opacity standard [Id. at 9–12]. Second, the defendant claims that the EPA's federal MACT rule establishes that COM data is not credible evidence of the defendant's violations. The defendant contends that federal courts have allowed the use of continuous emission monitoring data as "credible evidence" under only limited circumstances, such as citizen suits where the groups did not have reference

10

test method data or where such data did not exist or was never introduced [Id.]  Finally, the defendant asserts that COM data may only be used where VEOs are unavailable or incomplete, and that the United States has failed to show that it lacks sufficient VEOs to determine compliance.  Additionally, the defendant claims that five of the 19 alleged coke oven combustion stack emissions violations based on VEOs are not supported by data recorded by the defendant's COMs.

The United States' reply claims that the defendant's reliance on MACT standards is misplaced [Doc. 143].  According to the United States, MACT standards refer to technology-based emission limits for hazardous air pollutants established under Section 112 of the CAA, which is different from and independently enforceable by the United States from the violations claimed regarding PM and $SO_2$, standards established under Section 110 of the CAA.  The United States claims that the defendant is required under its Title V Permit to Operate to comply with both the health-based SIP limits and the technology-based MACT limits.  According to the United States, the opacity limits set forth in the SIP serve to attain and preserve air quality standards, while the MACT opacity levels limits serve to limit hazardous air pollutants in coke oven emissions to a level attainable by the best controlled coke oven battery stacks in the United States [Id. at 4].  The reply further claims that COM data is credible evidence of the defendant's combustion stack opacity violations.  The United States requests that because the defendant claims that five of the nineteen visible emission observations are not supported by the COM data, that the Court enter summary judgment in favor of the United States regarding the defendant's liability under the Third Claim for Relief for the 14 violations.  The United States reserves the right to prove that some or all of the challenged visible emission observations demonstrate

violations of the combustion stacks' opacity limits.  The United States also requests that the Court enter summary judgment in favor of the United States regarding the defendant's liability as to the 3,587 violations established by COM data.

### a.  MACT Opacity Standards

The MACT limits for coke ovens do not preclude the United States from enforcing opacity limits set forth in the West Virginia SIP.  The opacity limits set forth in the MACT are technology-based and are based on the maximum achievable control technology for hazardous air pollutants.  The CAA and West Virginia SIP serve to attain and preserve air quality standards in Brooke County, West Virginia.  MSC's Title V permit includes both the facility's SIP limits and its MACT limits.  The United States' failure to allege any violations of MACT standards, therefore, has no effect on its ability to claim violations of emission limits for criteria pollutants under the CAA and West Virginia SIP.

Accordingly, the West Virginia SIP limits and the MACT limits are not mutually exclusive and are independently enforceable by the United States.

### b.  COM Data

The West Virginia Code of State Rules regarding compliance test procedures to prevent and control particulate air pollution from manufacturing process operations states that the "opacity . . . of emissions from manufacturing process operations shall be determined visually by a qualified observer."  WV CSR § 45-7A-2.1.a.1.

The United States' reliance on West Virginia CSR § 45-38.5.1 for the proposition that it may any credible evidence for the purpose of establishing whether a person has violated emissions limits is misplaced.  Under § 45-38.5.1, the United States is permitted to use of any credible evidence violations where any rule enforceable by the Director "does not

contain definitive compliance determination procedures or if a related rule establishing such compliance determination procedures has not been authorized and adopted."  WV CSR § 45-38-3.

Similarly, MSC's Title V Operating Permit states that "Compliance with the visible emissions standards . . . shall be determined by observers certified in accordance with 40 C.F.R. Part 60 Appendix A, Method 9 and following the observation procedures of Method 9.  In determining compliance with the visible emission standards under 45CSR2 and any visible emissions limitations established in CO-SIP-91-29, each visible emission observation shall represent a fifteen (15) second period and visible emission observations shall not be averaged."  [Doc. 140-6 at 5].

The United States' claim that the Title V Permit allows the use of COM data in determining violations is unpersuasive.  Section 2.22.1 of the Title V Permit states:

> Nothing in this permit shall alter or affect the ability of any person to establish compliance with, or a violation of, any applicable requirement through the use of credible evidence to the extent authorized by law. Nothing in this permit shall be construed to waive any defenses otherwise available to the permittee including but not limited to any challenge to the credible evidence rule in the context of any future proceeding.

MSC Title Permit, § 2.22.1.  The EPA's rules on credible evidence state that "credible evidence revisions are not intended to and will not serve to affect the stringency of underlying emission standards by amending the nature of the compliance obligation."  COM data is taken every ten seconds, 24 hours per day and 365 days per year, whereas VEOs may be taken under prescribed conditions with less frequency.  Using COMs as "credible evidence," therefore, would affect the stringency of underlying emission standards by amending the nature of the compliance obligation.

13

Additionally, the United States' argument that using COM data as credible evidence in place of "unavailable or incomplete" VEO data fails as the United States does not give any indication why it believes the VEOs are unavailable or incomplete.  The defendant claims that it had hundreds of VEOs taken by certified observers at each of the four coke oven batteries on a weekly basis during the past five years [Doc. 140 at 17].  The United States does not aver that the VEOs were incomplete.  Therefore, there remains a genuine issue of material fact as to whether the VEOs were inadequate to establish compliance.

Accordingly, the United States' Motion for Partial Summary Judgment regarding MSC's liability under the Third Claim for Relief in the Complaint is hereby **GRANTED IN PART** as to the 14 undisputed violations of opacity limits of emissions from its coke oven combustion stacks.  The Motion is **DENIED IN PART** as to the remaining disputed visible emission observations and alleged 3,587 violations established by COM data.

### 2.  Hydrogen Sulfide Emissions

The plaintiff also moves for summary judgment on the defendant's liability on the Fifth Claim for Relief, which alleges that MSC violated the West Virginia SIP and its Title V Permit by combusting coke oven gas containing more than 50 grains of $H_2S$ per 100 cubic feet of gas.  The plaintiff alleges more than 800 emissions violations between March 2007 and June 2012.

The defendant's response does not dispute that some liability exists for violations alleged in the United States' fifth claim for relief [Doc. 140 at 20].  However, the defendant claims that a 1996 Consent Decree expressly exempts at least 106 of the exceedances for which the United States now seeks summary judgment as to liability [Id.].  The defendant

claims that in 1996, the United States and Wheeling-Pittsburgh, MSC's predecessor, signed a Consent Decree which resolves, *inter alia*, certain exceedances of the $H_2S$ standard set forth in the West Virginia SIP [Doc. 140 at 18].  The Consent Decree, according to the defendant, sets forth stipulated penalties for exceedances of the 50 grains of $H_2S$ per 100 cubic feet of gas standard, unless the violations fall within a *force majeure* provision, which excuses noncompliance caused by circumstances beyond MSC's control that could not have been prevented by the exercise of reasonable diligence [Id. At 19–20].  Additionally, the defendant argues that the United States is entitled to payment for the 740 non-disputed violations pursuant to the schedule of Stipulated Penalties set forth in the 1996 Consent Decree.

The United States' reply withdraws its motion for partial summary judgment regarding liability for the 106 disputed violations, which the defendant claims were the result of *force majeure* events.  The United States reserves the right to prove that some or all of the 106 challenged incidents are violations of the $H_2S$ standard.  The United States requests that the Court enter summary judgment in its favor regarding the remaining 740 violations.

As the defendant does not dispute liability as to the 740 violations, and the United States withdraws its summary judgment motion as to the additional 106 disputed violations, the Court hereby **GRANTS IN PART** the plaintiff's motion for partial summary judgment as to liability for the 740 violations set forth in the Fifth Claim for Relief and **DENIES** the motion for partial summary judgment as to liability for the 106 disputed violations, which the defendant claims fall under the *force majeure* provision of the 1996 Consent Decree.  The issue of remedies will be decided at a later date.  At that time, the Court will address the

defendant's argument that the 740 violations should be resolved through payment pursuant to the schedule of Stipulated Penalties set forth in the 1996 Consent Decree.

## B. RCRA Subtitle C Claim

In the Eighth Claim for Relief in the Complaint, the United States alleges that coke oven gas condensate (COGC) displays the toxicity characteristic for benzene, which makes it a hazardous waste under West Virginia Code of State Rules and the Resource Conservation and Recovery Act (RCRA) [Doc. 1 at ¶ 115]. The United States claims that the defendant failed to manage COGC as required by RCRA and the West Virginia Hazardous Waste Management Program [Id. at ¶ 116–19]. The parties filed cross motions for summary judgment regarding the United States' Eighth Claim for Relief.

The United States' motion for summary judgment alleges that the defendant has not complied with Subtitle C of the RCRA in managing coke oven gas condensate (COGC) [Doc. 125]. The United States claims that COGC is both a solid waste and a hazardous waste and is therefore subject to RCRA Subtitle C [Doc. 137 at 10–15]. The United States claims that the defendant's disposal of COGC does not constitute an excluded form of recycling under the RCRA [Id. at 15–20]. Further, the United States claims that any recycling defense must fail as a matter of law because MSC failed its legal burden to document its claimed recycling exception or set forth appropriate documentation that COGC is not a solid waste [Id. at 21–23].

The defendant's Response to the United States' Motion for Summary Judgment claims that COGC is not a solid waste as defined under RCRA because it is not discarded or abandoned [Docs. 128; 141 at 6–10]. The defendant claims that the presence of benzene is not dispositive of whether COGC is a waste under RCRA regulations [Id. at 11]. Third,

16

the defendant claims that the United States cannot make the required threshold showing that COGC is recycled in a manner that renders it a solid waste under RCRA.  Fourth, the defendant claims that COGC is exempt from regulation under the RCRA under the exemption for wastes from coke by-products plant processes [Id. at 19].  Finally, the defendant claims that it has provided ample documentation establishing the COGC is not a solid waste or, if a solid waste, is subject to recycling exemptions [Id. at 20–21].  The defendant reiterates these claims in it Motion for Summary Judgment and accompanying Memorandum in Support [Docs. 127, 128].

The United States' reply reiterates its original claims that the defendant failed to show that COGC is not a solid waste under RCRA and that its handling practice is not exempt under the RCRA.

The Court finds that COGC is not a solid waste, although there remains a genuine issue of material fact as to whether COGC is a solid waste as a result of emissions resulting from transfer.  Additionally, the Court finds that even if COGC were a solid waste, it does not fall under RCRA regulations because its use by MSC falls under the recycling exemption under the RCRA and MSC has adequately documented the recycling.  To that extent, the defendant's Motion for Summary Judgment is GRANTED.

### 1.   Whether COGC Subject to RCRA's Hazardous Waste Regulatory Program

In order to be subject to RCRA's hazardous waste regulatory program, a material must be both a "solid waste" and a "hazardous waste."  Respondents in enforcement actions who claim that a material is not a solid waste, or who claim exemption from regulation, have the burden of proving that there is a known market for disposition for the material, and that they meet the terms of the exclusion or exemption.  In doing so, they must provide appropriate

documentation to demonstrate that the material is not a waste, or is exempt from regulation. 40 C.F.R. § 261.2(f).  If respondents claim that they recycle the materials, they must show that they have the necessary equipment to do so. 40 C.F.R. § 261.2(f).  The defendant claims that COGC is not a solid waste and that it is exempt from regulation because it recycles the materials.

      a.  <u>Solid Waste</u>

The Court finds that the defendant is entitled to partial summary judgment on the United States' RCRA claims.  COGC is not an RCRA Subtitle C solid waste because it is recycled, not discarded as defined in 40 C.F.R. § 261.2.  Whether some COGC is disposed as volatilized emissions during transfer remains an issue for trial.

A "solid waste" is defined in 40 C.F.R. § 261.2 as discarded materials that are not otherwise excluded.  A discarded material is defined as material which is, *inter alia*, abandoned.  40 C.F.R. § 261.2(a)(2)(i).  The plaintiff claims that the materials are abandoned under RCRA.  The RCRA defines abandoned materials as materials which are disposed of; burned or incinerated; or accumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned or incinerated.  40 C.F.R. § 261.2(b).

The RCRA defines disposal as "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."  42 U.S.C. § 6903(3).

The plaintiff contends that the COGC collection and delivery process results in disposal subsequent to the abandonment of COGC in several ways [Doc. 137 at 11]. First, it claims that COGC is abandoned as it is accumulated and stored in the drip legs after being generated in the COG pipeline. Next, it claims that COGC is disposed when MSC allows the volatile constituents of COGC, namely benzene, to be emitted into the air when it is pumped from the drip legs into the drip trunk tank, and also when it is pumped from the drip truck into the conveyance trench and phenol pit sump. Third, the United States claims that COGC is abandoned through disposal when some of the COGC is sent to the ammonia still and to the wastewater treatment plant.

The defendant claims that the COGC in the drip legs is not a solid waste because it is beneficially recycled. It claims that any air emissions from coke batteries and byproducts plants during transfers of the COGC are specifically regulated by the Clean Air Act, not the RCRA [Doc. 141 at 9–10], and because the United States' argument is based on incorrect assertions regarding the method of transferring the COGC. The defendant also argues that COGC is not discarded by introducing the material into the ammonia still because COGC contains ammonia, which is recovered in the ammonia still [Id. at 10–1].

i. *COGC Stored in Drip Legs*

The United States contends that the COGC that forms in the coke oven gas pipeline is a solid waste because it is abandoned as it is accumulated and stored in the drip legs are being generated in the coke oven gas pipeline. The defendant asserts that the COGC is not a solid waste because it accumulates only briefly in the drip legs before being recycled. The Court does not find that the COGC stored in drip legs is a solid waste. The COGC is not abandoned through disposal or accumulated as is required to be a solid waste under

19

40 C.F.R. § 261.2(a-b).  Additionally, as will be discussed below, even if the COGC were

a solid waste, MSC's handling of COGC constitutes an excluded form of recycling under

the regulations, and therefore is exempt from regulation under the RCRA.  *See* Section

III(B)(2).

ii.  *Regulation of COGC Emissions During Transfer*

The United States contends that any emissions from the COGC liquid during transfers

of the liquid are regulated under RCRA regulations.  The defendant contests this, saying

any emissions are regulated under the CAA.  The Court agrees with the United States that

emissions from liquid COGC into the air are regulated under the RCRA.

Disposal is defined in RCRA as:

> [D]ischarge, deposit, injection, dumping, spilling, leaking, or placing of any
> solid waste or hazardous waste into or on any land or water so that such
> solid waste or hazardous waste or any constituent thereof may enter the
> environment or be emitted into the air or discharged into any waters,
> including ground waters.

42 U.S.C. § 6903(3).

The United States claims that the benzene is a constituent of the liquid COGC, and the

RCRA permits regulation of solid waste or hazardous waste "or any constituent thereof"

[Doc. 137 at 11–12].  Accordingly, the United States claims that when COGC's constituent

benzene is allegedly emitted during transfer of the liquid COGC, the RCRA statute permits

regulation of constituents of solid or hazardous waste that are emitted into the air.

The defendant contends that the RCRA definition of solid waste specifically excludes

volatilized COGC [Doc. 141 at 8].  Solid waste is defined as "discarded material, including

solid, liquid, semisolid, or contained gaseous material."  42 U.S.C. § 6903(27).  The

20

defendant claims that any volatilized COGC into the ambient air would be uncontained gaseous material, which is excluded from the definition of solid waste.

The definition of disposal in the RCRA extends to air emissions of volatilized COGC. Accordingly, any such emissions are regulated by the RCRA.

### iii.  *Emission of Volatile Constituents of COGC into the Air*

According to the United States, MSC allows the volatile constituents of COGC to be emitted into the air first, when the COGC is pumped from drip legs into the drip truck tank, and second, after it is pumped from the drip truck and poured through a hose into the open conveyance trench and phenol pit sump.  The United States claims that MSC does not use emission-reducing hoses, usually consisting of cam-lock connectors, when the drip truck hooks up by hose to the drip legs and pumps out COGC.  The defendant asserts that it does use cam-lock connectors to reduce emissions by sealing around the drip leg valves [Doc. 141 at 10].  The parties' dispute as to whether the defendant uses cam-lock connectors to form a seal between the drip truck hose and the drip legs is an issue of material fact for trial.

The defendant also contests the United States' claim that the transfer of COGC by hose from the drip truck into a conveyance trench constitutes a discharge to land or water because the concrete conveyance trench prevents any possibility of contact between COGC and land.  It also claims that the phenol pit sump is not open to ambient air. Whether the phenol pit sump is open to ambient air is also an issue of material fact for trial. As such, whether COGC is discarded when it is accumulated and stored in drip legs may not be determined by motion for summary judgment.

### iv.  *COGC Discharge to the Ammonia Still*

The parties agree that a portion of the COGC becomes mixed with flushing liquor and is diverted to the ammonia still, where ammonia is distilled from the liquid.  The parties dispute the impact of the mixing.  The United States claims that COGC is abandoned through disposal rather than recycled during this process because the amount of COGC being added to the excess flushing liquor that gets distilled is extremely small [Doc. 137 at 13].  The United States also states that if MSC claims that COGC is beneficial to the ammonia distillation process, it bears the burden of proving its claim with specific evidence of COGC's useful effects.

The defendant contests the United States' assertion that the quantity of COGC is too small to add value to the ammonia distillation process.  MSC claims that COGC contains ammonia, which is the product that the distillation process is intended to cover, and that it has provided ample evidence of its recovery and use of ammonia in the production and sale of marketable commodities [Doc. 141 at 10].

The Court is unpersuaded by the United States' argument that MSC has not satisfied its burden because it does not provide exact calculations of the quantity of ammonia that is produced from the portion of COGC mixed into the flushing liquor circuit.  The COGC is sent to the ammonia still for purposes of removing the ammonia.  In turn, MSC recovers and uses ammonia in the production and sale of marketable commodities.  Accordingly, the United States is not entitled to summary judgment on its claim that MSC's diversion  of COGC to the ammonia still constitutes discharge and therefore a solid waste.

      b.  <u>Hazardous Waste</u>

The EPA has designated three ways in which a solid waste may also qualify as a hazardous waste.  Unless excluded, a solid waste may also qualify as a hazardous waste by 1) being explicitly listed as such because it contains certain toxic constituents; 2) exhibiting one or more of the hazardous characteristics of ignitability, corrosivity, reactivity, and toxicity; or 3) being mixed with solid or listed hazardous wastes.  40 C.F.R. § 261.3(a).

The plaintiff contends that COGC exhibits the toxicity characteristic for benzene and thus constitutes a hazardous waste under the applicable RCRA regulations.

The defendant contests the United States' claim that the presence of benzene in COGC makes it a hazardous waste.  According to the defendant, determination of whether COGC is a solid waste must be based exclusively on MSC's intent to discard and, because MSC beneficially recycles the COGC in a continuous process, it cannot be a hazardous waste.

In order for waste to be classified as hazardous under RCRA, "it must first qualify as a solid waste" pursuant to the statute.  *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1313 (2d Cir. 1993); *see also* 42 U.S.C. § 6903(5) ("The term 'hazardous waste' means a solid waste [that also has additional characteristics.]").  As a threshold matter, because the United States' is not entitled to summary judgment on whether COGC is a solid waste, the Court may not classify COGC as hazardous under the RCRA.

### 2. COGC is Not a Solid Waste Under the RCRA, Even if Such a Showing Were Made, MSC's Handling of COGC Would Constitute an Excluded Form of Recycling under the Regulations

The United States maintains that MSC's handling of COGC does not constitute an exempt form of recycling [Doc. 126 at 20]. The United States claims that COGC does not satisfy Subtitle C exceptions for materials that are not a solid waste when recycled or Subtitle C exceptions for wastes from coke by-products processes. The Court finds that the United States has failed to show that COGC is a solid waste and that even if this Court considered COGC a solid waste, MSC's handling of COGC would constitute an exempt form of recycling.

### a. COGC is Not a Solid Waste Under 40 C.F.R. § 261.2(a-b)

The plaintiff is required to show that COGC is a solid waste under 40 C.F.R. § 261.2(a-b). Once shown, a respondent who raises a claim that a certain material is not a solid waste, or is conditionally exempt from regulation, must demonstrate that there is a known market or disposition for the material, and that they meet the terms of the exclusion or exemption. 40 C.F.R. § 261.2(f).

As discussed above, the plaintiff has failed to show the COGC in the drip legs is a solid waste, meaning a discarded material which is abandoned by being disposed of or accumulated.

### b. Exception for Materials That Are Not a Solid Waste When Recycled

As the Court has determined that the plaintiff failed to show that COGC is a solid waste under 40 C.F.R. § 261.2(a-b), the Court need not address exemptions which are contained in 40 C.F.R. § 261.2(e). However, even if the plaintiff had shown that COGC is a solid waste, the recycling exemptions of 40 C.F.R. § 261.2(e) would apply to COGC.

24

A material may be a solid waste if it is recycled in certain ways.  The regulations at 40 C.F.R. Part 251 separate secondary materials that are recycled into two categories—materials classified as solid waste, and thus subject to regulation under RCRA, and those not considered solid wastes when they are recycled, and thus not regulated. Materials recycled by certain methods are not solid waste where they are:

> (i) Used or reused as ingredients in an industrial process to make a product, provided the materials are not being reclaimed; or
>
> (ii) Used or reused as effective substitutes for commercial products; or
>
> (iii) Returned to the original process from which they are generated, without first being reclaimed or land disposed. The material must be returned as a substitute for feedstock materials. In cases where the original process to which the material is returned is a secondary process, the materials must be managed such that there is no placement on the land. In cases where the materials are generated and reclaimed within the primary mineral processing industry, the conditions of the exclusion found at § 261.4(a)(17) apply rather than this paragraph.

The defendant's Response states that the United States' claim fails without the need to undertake an analysis of the recycling exemptions because the exemptions only to materials that are solid waste under 40 C.F.R. § 261.2(c), and COGC is not a solid waste. The defendant additionally claims that even if COGC were a solid waste, its reintroduction into the flushing liquor circuit is an exempt form of recycling and satisfies all three criteria for the Subtitle C general exclusion.  The Court finds that COGC's reintroduction into the flushing liquor circuit is an exempt form of recycling under the first criteria for Subtitle C general exclusion.

i.  *Used or reused as ingredients in an industrial process to make a product*

The United States asserts that MSC cannot meet the first criteria because the amounts of any products derived from the addition of pipeline COGC to flushing liquor are "at best trivial." [Doc. 126 at 21].  The United States cites to 50 Fed. Reg. at 638, which states that "where a secondary material is ineffective or only marginally effective for the claimed use, the activity is not recycling but surrogate disposal."  50 Fed. Reg. at 638.

The defendant contests the United States' assertion.  MSC claims that a portion of the recycling of COGC goes to cooling and conditioning as part of the flushing liquor circuit, and the rest is reclaimed in order to extract ammonia, coal tar, benzene, and other light oils before it leaves the processing plant [Doc. 141 at 15].  The defendant claims that MSC recovers between 20,000 and 50,000 pounds of products from recycling COGC which it then sells for profit [Id.].

Both parties cite to 50 Fed. Reg. At 638, which states that where a secondary materially Is "only marginally effective for the claimed use, the activity is not recycling but surrogate disposal. An example . . . [is the] use of certain heavy metal sludges in concrete. The sludges did not contribute any significant element to the concrete's property."  The United States maintains that the because the amount of COGC compared to excess flushing liquor is minuscule, it is not sufficient for demonstrating legitimate recycling.  The defendant, however, cites to the example of heavy metal sludges as criterion intended to prevent manufacturers from developing processes that incorporate hazardous constituents into the final product when they are not needed [Doc. 141 at 14].

The Court agrees with the defendant that the recycling of COGC is used in the flushing liquor circuit for cooling and conditioning, and the remainder is reclaimed in order to extract ammonia, coal tar, benzene and other light oils before leaving the processing plant.

26

Accordingly, if COGC were a solid waste, it would be exempt from regulation as used or reused as ingredients in an industrial process to make a product.

### ii. *Used or reused as effective substitutes for commercial products*

The United States refutes MSC's assertion that COGC functions as an "effective substitute" for flushing liquor and hence fulfills the criterion of 40 C.F.R. § 261.2(e)(ii). According to the United States, there is more than enough flushing liquor to cool the coke oven gas without the addition of COGC.  It states that because a large amount of flushing liquor is sent each day to the ammonia still and wastewater treatment plant as "excess", that it is unnecessary to use COGC collected from drip legs.  The United States claims that the COGC furnished no more than 0.04% of the flushing liquor used for coke oven gas quenching at any given time.

The defendant contends that COGC is an effective substitute for flushing liquor because it is virtually identical to flushing liquor.  The defendant states that all flushing liquor was at some point COGC and, as such, is an effective replacement for flushing liquor.

The Court agrees with the United States that COGC is not used as an effective substitute for a commercial product.  However, because the Court already found that COGC is used as an ingredient in an industrial process to make a product, and because MSC need meet only one of the three criteria to show that materials are not a solid waste when they are recycled, COGC is exempt from regulation.

### iii. *Returned to the original process from which they are generated*

The United States also claims that MSC cannot meet the third criteria, that the materials are returned to the original process from which they are generated, without first being reclaimed or land disposed, because the COGC is delivered to the coke plant byproducts plant. As such it is not returned to the original process from which it is generated.

The defendant claims that COGC still qualifies for the exemption as Courts have repeatedly recognized that the exemption applies to materials that are recycled to other phases of the production process, as long as they are within the same industry [Doc. 141 at 18].

The United States' reply claims that because COGC is generated within the pipeline, but is then transported to the conveyance trench, pit sump, or other parts of the byproducts plant, that does not constitute being returned to the original process from which it is generated [Doc. 146 at 9–10].

The Court need not make a determination on this issue as it has already determined that COGC is used as an ingredient in an industrial process to make a product and is therefore exempt from regulation.

c.  Exception for Wastes From Coke By-Products Processes

MSC claims that COGC qualifies for a Subtitle C recycling exclusion which exempts certain wastes from the metallurgical coke production process. The following materials are not solid wastes:

> [A]ny wastes from the coke by-products process that are hazardous only because they exhibit the Toxicity Characteristic (TC) specified in section 261.24 . . . when, subsequent to generation, these materials are recycled to coke ovens, to the tar recovery process as a feedstock to produce coal tar, or mixed with coal tar prior to the tar's sale or refining.

28

40 C.F.R. § 261.4(10).

The United States contends that because COGC exhibits the toxicity characteristics for benzene, it is eligible for the recycling exclusion if it satisfies one of the three recycling criteria listed in the exclusion.   The only recycling criteria that might be applicable, according to the United States, is the recycling to the tar recovery process as feedstock to produce coal tar.  The United States claims that because COGC is 99.4% water, it cannot function as a "feedstock" for coal tar production under the second exclusion because it is not tarry in composition, and therefore cannot enhance tar production.

MSC's response contests the United States' assertion that COGC cannot be a "feedstock" for coal tar production because it is 99.4% water.  The defendant claims that it has produced evidence showing that coal tar is extracted from COGC and sold for profit [Doc. 141 at 19].  As a result, MSC contends that it is exempt from RCRA on this ground.

The United States' reply claims that MSC has failed to explain what contribution, if any, COGC has made to MSC's coal tar production figures.

The Court finds that neither party is entitled to summary judgment regarding whether COGC is exempt under the exemption for wastes from coke by-products plant processes as a feedstock for coal tar production.

### 3.  Defendant's Documentation of its Claims that COGC is not a Solid Waste or Qualifies for a Recycling Exemption

The United States moves for summary judgment based on its contention that MSC failed to provide appropriate documentation to support its recycling exception claim.  It claims that MSC's failure to provide appropriate documentation to support its recycling claim shows as a matter of law that MSC failed to satisfy its burden under 40 C.F.R.

§ 261.2(f) to support a recycling exception claim.  The United States claims that under 40 C.F.R. § 261.2(f), respondents in actions to enforce regulations implementing Subtitle C of RCRA who raise a claim that a certain material is not a solid waste or is conditionally exempt from regulation must provide appropriate documentation to demonstrate that the material is not a waste or is exempt from regulation [Doc. 126 at 31].  The United States claims that MSC's COGC records demonstrate only that COGC is returned to the byproducts plant, not that the recycling is beneficial to MSC's process.  As such, the United States contends that MSC is engaging in sham recycling of COGC.

MSC's response claims that it has provided the amount of COGC recycled and quantities of byproducts sold, including ammonia, naphtalene, coal tar, benzene, and other light oils [Doc. 141 at 20].  MSC also contends that it has estimated the quantity of valuable products produced by the recycling of COGC at between 20,000 and 50,000 pounds of valuable byproducts each year [Id.].

The United States' reply disputes MSC's claims regarding the amount of COGC and quantities of byproducts sold as meaningless to show whether MSC gains any value from generating the byproducts [Doc. 146 at 3–4].  The United States also claims that MSC provides no documentation of the source of its estimated 20,000 to 50,000 pounds of COGC contribution to byproducts production.

As discussed above, the Court agrees with the defendant that is has provided sufficient evidence to support a recycling exception claim.  Accordingly, the United States' Motion for Summary Judgment on the ground that MSC has failed to set forth appropriate documentation of its claims that COGC is not a solid waste or qualifies for a recycling exemption is DENIED.

### 4.  Claim 12

In its Twelfth Claim for Relief, the United States contends that various drip leg tanks, the Pit Sump, the conveyance trench into the Pit Sump, and the Tar Decanter Sump at MSC are subject to RCRA Subtitle I, which regulates Underground Storage Tanks (UST) [Doc. 1 at ¶¶ 146–54].

The defendant's Motion for Summary Judgment asserts that the claim fails as a matter of law because each of the units alleged to be subject to RCRA Subtitle I is properly classified as an exempt wastewater treatment unit [Doc. 128 at 18–20].  According to the defendant, the pit sump and decanter sump are "field-constructed tanks" which were deferred from regulation by the EPA.  Additionally, the defendant claims that all of the units qualify as "flow-through process tanks" which are exempt from regulation.

### a.  Wastewater Treatment Unit

The United States' Response claims that MSC fails to put forth any facts to support the wastewater treatment unit exemption claim [Doc. 139 at 20].  Accordingly, the United States claims that the Twelfth Claim for Relief in the Complaint is valid because MSC's underground drip leg storage tanks are regulated underground storage tanks (USTs) as defined in 40 C.F.R. § 280.12 [Doc. 139 at 20].  Regulated USTs are defined as tanks "used to contain an accumulation of regulated substances, the volume of which is 10% or more beneath the surface of the ground." 40 C.F.R. § 280.20.  The United States claims that the wastewater treatment exemption only applies to UST systems dedicated for use with an on-site wastewater facility and no evidence exists that the vessels treat or store wastewater prior to discharge to the wastewater treatment plant [Id. at 21].

MSC's Reply claims that only eight of the drip legs fall within the definition of USTs and, of those, only three were active as of June 2007 [Doc. 150 at 14].

The Court agrees with the United States that the underground drip legs are not wastewater treatment units.

### b.   Field-Constructed Tanks

MSC contends that the pit sump and decanter sump are "field-constructed tanks," meaning that they were constructed in the field instead of in a factory [Doc. 128 at 18–19]. MSC's Reply attaches as evidence drawings for the tar decanter sump and the pit sump [Doc. 150, Exhibit G].

The United States claims that MSC has failed to meet its initial burden on summary judgment of showing there is not genuine issue of fact on the issue [Doc. 139 at 21–22]. The United States claims that MSC does not provide a single citation to the record as to the construction of the vessels, and line drawings of the pit sump produced by the defendant indicate that it was built with a manufactured tank.

The two drawings provided by MSC are insufficient to prove that there is no genuine issue of fact on whether the pit sump and tar decanter sump are field constructed tanks. Accordingly, defendant's motion for summary judgment on plaintiff's twelfth claim for relief on the ground that the pit sump and decanter sump are not subject to the Subtitle I technical standards under the field-constructed tanks exception is DENIED.

### c.   Flow-Through Process Tanks

32

MSC next claims that all of the units qualify as "flow-through process tanks" which are also exempt from regulation.

EPA regulations define a flow-through process tanks as:

> A tank that forms an integral part of a production process through which there is a steady, variable, recurring, or intermittent flow of materials during the operation of the process. Flow-through process tanks do not include tanks used for the storage of materials prior to their introduction to the process or for the storage of finished products or by-products from the production process.

40 C.F.R. § 280.12.

MSC contends that the units it uses to handle pipeline COGC form an integral part of the byproducts plant production process as they route condensate to the production process where it is used for cooling and conditioning and from which valuable materials are reclaimed [Doc. 128 at 19–20].  The defendant also asserts that the flow of the pipeline COGC is steady through certain units and recurring or intermittent during the operation of the byproducts production process [Id]  The defendant contends that even though some of the COGC is collected and transported from one unit to another, instead of being piped, material is still being continually routed through the production process and is integral to that process [Id. at 20].

The United States' Response claims that underground drip legs are not flow-through process tanks because they do not form an integral part of the production process as required under 40 C.F.R. § 280.12 [Doc. 139 at 22].  According to the United States, COGC forms only a small fraction of the flushing liquor to which it is added and MSC provides no evidence that the cooling of coke oven gas and the production of byproducts would be impacted by the absence of pipeline COGC.  The United States contends that MSC

33

manages COGC as a low value material having no critical role in the operation of the facility [Id.].

The Court does not find that there is no genuine issue of material fact as to whether the units are flow-through process tanks.

Accordingly, defendant's Motion for Summary Judgment as it pertains to Count 12 is DENIED.

## IV.   Conclusion

For the reasons set forth above, the plaintiff's Motion for Partial Summary Judgment on its Clean Air Act Claims **[Doc. 116]** is **GRANTED IN PART AND DENIED IN PART**.  The plaintiff's Motion for Partial Summary Judgement on its RCRA Subtitle C Claim and to Dismiss Defendant's Eighth and Ninth Defenses **[Doc. 125]** is **DENIED**.  The Defendant's Motion for Summary Judgment on the United States' Resource Conservation and Recovery Act Claims **[Doc. 127]** is **GRANTED IN PART** and **DENIED IN PART**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** January 14, 2014.

JOHN PRESTON BAILEY
CHIEF UNITED STATES DISTRICT JUDGE